STERLING DRUG, INC. *v.* Charles G. OXFORD

87-172                                        743 S.W.2d 380

Supreme Court of Arkansas
Opinion delivered January 19, 1988
[Supplemental Opinion on Denial of Rehearing April 4, 1988.*]

*Purtle, J., dissents; Dudley, J., would grant rehearing.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, by: *M. Stephen Bingham*, for appellant.

*Ronald G. Naramore, Bryan Reis*, and *Q. Byrum Hurst*, for appellee.

JACK HOLT, JR., Chief Justice. This is an outrage and wrongful discharge action. Jurisdiction is pursuant to Ark. Sup. Ct. R. 29(1)(o).

From 1963 until October 31, 1983, the appellee, Charles G. Oxford ("Oxford"), was employed under a contract for an indefinite term by what is now the National Laboratories Division of Lehn and Fink Industrial Products Division, Inc., a division of the appellant, Sterling Drug, Inc. ("Sterling"). In 1984 Oxford filed suit against Sterling alleging that through acts of its agents, Sterling had engaged in a systematic campaign from January of 1982 until August of 1983 designed to force Oxford's resignation because it believed that he had reported Sterling to the General Services Administration ("GSA") for submitting false information during GSA contract negotiations. The jury received instructions on both wrongful discharge in violation of the public policy of the state and outrage. It returned a general verdict in favor of Oxford for compensatory damages in the amount of $201,700.000 and punitive damages in the amount of $150,000.00. The circuit court denied Sterling's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. We reverse the judgment of the trial court and remand for further proceedings on the wrongful discharge claim.

Don Dunston ("Dunston"), a former Sterling employee and Oxford's supervisor, testified at trial that Ray Mitchell, president of Lehn and Fink Industrial Products Division, Inc., stated in October of 1981 that he believed Oxford had reported Sterling to the GSA for pricing violations. As a result of these violations, Sterling paid $1,075,000.00 to the federal government in a 1984 settlement. It was in October of 1981 that Sterling advised

Oxford that his position, manager of contract sales, would be eliminated as of January 1, 1982, due to a company reorganization. In February of 1982, Oxford accepted a position as district sales manager, the lowest position in the National Laboratories Division hierarchy, for an area in east Texas.

Dunston also testified that he wrote an "EEO" letter to Oxford on January 29, 1982, at the request of Bill Milliron ("Milliron"), a former Industrial Products Division executive. An "EEO" letter is a nickname for a letter used to set an employee up for termination. Dunston recalled that he had told Milliron it was not the time to deal with Oxford in this manner because he was under severe pressure due to a recent divorce. The letter carefully detailed various day to day responsibilities for Oxford, one of which was conducting floor care demonstrations five nights a week after business hours. Dunston later criticized Oxford repeatedly about his job performance in these assigned responsibilities. Dunston acknowledged that his actions followed the company procedure outlined by Milliron to document an employee termination and that he had written an "EEO" letter only twice before, one to another regional manager and one to a district manager. Both men resigned under pressure.

At trial, Oxford denied that he had reported Sterling to the GSA. Oxford also testified that Dunston reprimanded him for acts he had not done and that he was not given the stock he had won in a company sales contest. Additionally, he stated that because of his employment conditions, he left his territory in August of 1983 without receiving prior approval from Sterling. Oxford did not return to work, and Sterling discharged him on October 31, 1983.

## I. OUTRAGE

Sterling argues that there is no substantial evidence in the record to support a jury verdict for outrage. One is subject to liability for outrage if he or she willfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct. *M.B.M. Co., Inc.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). In *Counce* we stated, "By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in civilized society." The employer in *Counce* discharged an employee supposedly because her services were no longer needed. After her termination, the employer told the employee that she would have to take a polygraph test in connection with a money shortage at the store before the company would release her last paycheck. Even though she passed the test, the employer deducted $36.00 from her paycheck as her share of the missing money. We found that there was a material issue of fact as to whether the employer's conduct was extreme and outrageous.

In *Tandy Corp.* v. *Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984), an employer interrogated an employee, whom it suspected of theft, at thirty minute intervals for most of a day, denied him valium when he was under obvious stress, and threatened him with arrest. In holding there was substantial evidence to support the jury verdict for outrage, we placed special emphasis on the fact that even though the employer knew of the employee's lower than normal emotional stamina, it refused to permit him to take his medication during the interrogation.

In *Hess* v. *Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985), *cert. denied*, 475 U.S. 1036, 106 S. Ct. 1245 (1986), Treece, a police officer, sued Hess, the Little Rock City Director, for outrage. Hess, who was angry with Treece over a personal matter, conducted surveillance of Treece, communicated to other individuals that he would have Treece fired at any cost, and apparently made false reports concerning Treece's employment conduct. Basing our decision in part on the fact that Hess' actions continued over a two year time span, we found there was substantial evidence to support the jury verdict for outrage.

Sterling's conduct continued over an eighteen month period. In addition, there is ample evidence that agents of Sterling knew that Oxford was under severe pressure because of a recent divorce. Nevertheless, Sterling's conduct did not rise to a sufficient level to support a verdict for outrage. It was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Counce, supra*. The recognition of the tort of outrage does not open the doors of the courts to every slight insult or indignity one must endure in life.

*Tandy, supra.* We must reverse the trial court judgment as to the outrage cause of action.

## II. WRONGFUL DISCHARGE

█ Sterling contends that the trial court erred in instructing the jury as to wrongful discharge in violation of the public policy of the state since there is no such cause of action in Arkansas. We have repeatedly held that when an employee's contract of employment is for an indefinite term, either party may terminate the relationship without cause or at will. *Griffin* v. *Erickson*, 277 Ark. 433, 642 S.W.2d 308 (1982). We recently modified the employment-at-will doctrine to provide that where an at-will employee (one employed for an indefinite term) relies on a personnel manual or employment agreement that expressly states that he or she cannot be discharged except for cause, the employee may not be arbitrarily discharged in violation of such a provision. *Gladden* v. *Ark. Children's Hosp.*, 292 Ark. 130, 728 S.W.2d 501 (1987).

In *Scholtes* v. *Signal Delivery Service, Inc.*, 548 F. Supp. 487 (W.D. Ark. 1982), Judge H. Franklin Waters assessed the state of Arkansas law concerning the employment-at-will doctrine. He stated:

> [W]e have no hesitancy in concluding that Arkansas law would recognize at least four exceptions to the at-will doctrine, excluding implied contracts and estoppel. These are: (1) cases in which the employee is discharged for refusing to violate a criminal statute; (2) cases in which the employee is discharged for exercising a statutory right; (3) cases in which the employee is discharged for complying with a statutory duty; and (4) cases in which employees are discharged in violation of the general public policy of the state.

In *Lucas* v. *Brown & Root, Inc.*, 736 F.2d 1202 (8th Cir. 1984), the employer allegedly fired an at-will employee because she would not "sleep" with her foreman. The court held that the employee's complaint stated a cause of action for wrongful discharge in violation of the public policy of Arkansas. The court found that if the allegations were true, the public policy of the state was contravened because "[a] woman invited to trade

herself for a job is in effect being asked to become a prostitute."

In *Counce, supra,* we acknowledged that we might recognize an exception to the at-will doctrine if an employee is "discharged for exercising a statutory right, or for performing a duty required of her by law or that the reason for the discharge was in violation of some other well established public policy." In *Jackson* v. *Kinark Corp.*, 282 Ark. 548, 669 S.W.2d 898 (1984), we noted the judicial trend of other states in softening the at-will rule either by finding an express or implied agreement for a specified period of employment or by imposing a duty on an employer not to discharge an employee arbitrarily or in bad faith but did not find it necessary to explore the issue.

An increasing number of other state courts have granted an exception to the employment at-will doctrine for employees who have been discharged in contravention of the public policy of the state. Some jurisdictions have permitted wrongful discharge actions where an employer terminated an employee for refusing to violate a specific statute. *Petermann* v. *International Brotherhood of Teamsters*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959) (refusing to commit perjury); *Tameny* v. *Atlantic Richfield Co.*, 27 Cal. 3d 167, 610 P.2d 1330, 164 Cal. Rptr. 839 (1980) (refusing to engage in a scheme to fix retail gasoline prices); *Wagenseller* v. *Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025 (1985) (refusing to commit an act which might violate indecent exposure laws); *Sabine Pilot Service, Inc.* v. *Hauck*, 687 S.W.2d 733 (Tex. 1985) (refusing to pump bilges into coastal waters). Courts have also allowed actions for employees discharged for exercising a statutory right. *Frampton* v. *Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973) (filing a workers' compensation claim); *Midgett* v. *Sackett-Chicago, Inc.*, 105 Ill. 2d 143, 473 N.E.2d 1280 (1984), *cert. denied*, 472 U.S. 1032 (1985) (filing a workers' compensation claim); *Cleary* v. *American Airlines, Inc.*, 111 Cal. App. 3d 443, 168 Cal. Rptr. 722 (1980) (engaging in union activities). Other jurisdictions have held that an at-will employee may not be fired for complying with a statutory duty. *Ludwick* v. *This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985) (obeying subpoena requiring appearance at a hearing); *Reuther* v. *Fowler & Williams, Inc.*, 255 Pa. Super. 28, 386 A.2d 119 (1978) (serving jury duty); *Nees* v. *Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (serving jury

duty).

The Supreme Court of New Hampshire in *Monge* v. *Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), created an expansive exception to the employment-at-will doctrine by holding that an employer wrongfully discharged an employee when it fired her for refusing to "go out" with her foreman. The court stated, "[A] termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interests of the economic system or the public good and constitutes a breach of the employment contract." The court later construed *Monge* to apply "only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." *Howard* v. *Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273 (1980).

In *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), an employer fired a salesman because it wanted to avoid paying him certain sales bonuses. The Supreme Judicial Court of Massachusetts held the employer liable for wrongful discharge. Following New Hampshire's lead in *Monge*, the court implied a covenant of good faith and fair dealing into every employment contract.

A few courts have permitted a cause of action for at-will employees discharged for protesting their employer's violation of state or federal law. In *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), the Supreme Court of Connecticut held that an employee stated a cause of action for wrongful discharge when he alleged that he had been fired for insisting that the employer comply with state food labelling and licensing laws. In *Harless* v. *First National Bank in Fairmont*, 162 W. Va. 116, 246 S.E.2d 270 (1978), the Supreme Court of Appeals of West Virginia held that the employee's complaint stated a cause of action for wrongful discharge where the employer fired the employee for attempting to induce the employer to comply with state and federal consumer credit and protection laws.

A very small number of jurisdictions have allowed a wrongful discharge claim where an employer terminated an at-will employee for reporting or threatening to report violations of state or federal law to the authorities. In *Garibaldi* v. *Lucky Food*

*Stores, Inc.*, 726 F.2d 1367 (9th Cir. 1984), *cert. denied*, 471 U.S. 1099 (1985), an employee alleged that he had been fired for reporting a shipment of adulterated milk to health authorities after his supervisors ordered him to deliver it. The court found that "whistle blowing" to protect the health and safety of the citizens of California was exactly the type of conduct that the Supreme Court of California protected in *Tameny, supra.* The Court of Appeals of Oregon in *McQuary* v. *Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 684 P.2d 21, *cert. denied*, 688 P.2d 845 (Or. 1984), held that a nursing supervisor stated a cause of action for wrongful discharge when she asserted that she had been terminated for threatening to report patient abuse to state authorities.

In *Palmateer* v. *International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981), the Supreme Court of Illinois held that an employee stated a cause of action for retaliatory discharge where the employer allegedly fired him because he offered to testify and gather evidence against another employee suspected of criminal activities. The court, noting a precise definition of the term "public policy," surveyed cases from other states and found that where a matter strikes at the heart of a citizen's social rights, duties, and responsibilities, a cause of action for wrongful discharge has been allowed. The court stated, "There is no public policy more basic, nothing more implicit in the concept of ordered liberty than the enforcement of a State's criminal code. . . . Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy."

In *Wagner* v. *City of Globe*, 150 Ariz. 82, 722 P.2d 250 (1986), a probationary police officer was allegedly discharged for informing the local magistrate that a prisoner was being held illegally in the city jail. The Supreme Court of Arizona held that if the officer's assertions were true, he had stated a valid cause of action for wrongful termination in violation of an important public policy of the state. The court found that "whistle blowing" to expose illegal or unsafe conduct should be encouraged and protected when it serves the public good.

■ We are now squarely faced with the decision of whether or not to recognize the public policy exception to the employment-

at-will doctrine. Following our lead in *Counce, supra*, we acknowledge that an employer should not have an absolute and unfettered right to terminate an employee for an act done for the good of the public. Therefore, we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state. This is a limited exception to the employment-at-will doctrine. It is not meant to protect merely private or proprietary interests. *Wagner, supra.*

In making this exception, we must resolve the question of whether a public policy exception case sounds in contract, tort, or both. The overwhelming majority of these actions have sounded in tort. *Palmateer, supra; Wagner, supra. Petermann, supra*, is one of the few public policy exception contract cases (California now recognizes a tort cause of action. *Tameny, supra.*). Cases implying a covenant of good faith and fair dealing generally have been contract actions. *Fortune, supra; contra Gates* v. *Life of Montana Ins. Co.*, 205 Mont. 304, 668 P.2d 213 (1983). New Jersey recognizes that both theories are appropriate in public policy wrongful discharge actions. *Pierce* v. *Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980).

Only one state, Wisconsin, has made a deliberate decision to adhere to an exclusive contract view. *Brockmeyer* v. *Dun & Bradstreet*, 133 Wis. 2d 561, 335 N.W.2d 834 (1983). We find this decision to be pragmatic and well reasoned. Since a public policy discharge action is essentially predicated on the breach of an implied provision that an employer will not discharge an employee for an act done in the public interest, a contract cause of action is most appropriate. *Id.* The exclusive contract approach strikes a fair balance in that it provides employees with protection from employer retaliation, while at the same time limiting recovery to contract remedies. If an employer's conduct in breaching a contract of employment is sufficiently egregious or extreme, the employee can still claim tort damages on a cause of action for outrage. For these reasons, we adopt the exclusive contract approach.

It is generally recognized that the public policy of a state is found in its constitution and statutes. *Kirksey* v. *City of Fort Smith*, 227 Ark. 630, 300 S.W.2d 257 (1957). Ark. Code

Ann. § 5-53-112 (1987) provides:

> (1) A person commits the offense of retaliation against a witness, informant, or juror if he harms or threatens to harm another by any unlawful act in retaliation for anything lawfully done in the capacity of witness, informant, or juror.

> (2) Retaliation against witnesses, informants, or jurors is a class A misdemeanor.

Ark. Code Ann. § 5-53-112 illustrates that there is an established public policy favoring citizen informants or crime fighters. In order to further the public good, citizens of the state should be encouraged to report illegal activity. We find that the public policy of the state is contravened if an employer discharges an employee for reporting a violation of state or federal law.

In a 1984 settlement agreement, the United States contended that Sterling had submitted false and incomplete pricing data and other pertinent information during the negotiation of GSA contracts. It alleged that this conduct was a violation of the False Claims Act, 31 U.S.C. §§ 3729-31 (1983). Pursuant to this agreement, Sterling paid $1,075,000.00 to the federal government.

A constructive discharge exists when an employer intentionally renders an employee's working conditions intolerable and thus forces him to resign. *Harris* v. *Wal-Mart*, 658 F. Supp. 62 (E.D. Ark. 1987). It exists only when a reasonable person would have resigned under the same or similar circumstances. *Id.* There is sufficient evidence that Sterling engaged in a continuous campaign to force Oxford's resignation because it believed he had reported Sterling to the GSA for pricing violations and that a reasonable person would have resigned under the same or similar circumstances. We find that a jury verdict for wrongful discharge is supported by substantial evidence.

In making its determination, the jury utilized a general verdict form. We cannot ascertain if it based its verdict for Oxford on the claim of outrage or wrongful discharge or both. Since the issue of outrage was improperly submitted to the jury, we cannot affirm the judgment of the trial court. *See Elk Corp. of*

*Ark.* v. *Jackson,* 291 Ark. 448, 725 S.W.2d 829 (1987); *Carrigan* v. *Nichols,* 148 Ark. 336, 230 S.W. 9 (1921). Accordingly, we reverse and remand for further proceedings on the wrongful discharge claim.

## III. ISSUES ON REMAND

Since this case will be remanded, we will address other issues that Sterling has raised and issues that are likely to arise on retrial. In remanding to the trial court, it is necessary we resolve what the measure of damages will be in a public policy exception action.

When an employee for a fixed term is wrongfully discharged, the measure of damages is computed according to when the case is tried. If the trial occurs before the expiration of the contract term, the employee is entitled to recover lost wages up until the day of trial. *Seaman Stores* v. *Porter,* 180 Ark. 860, 23 S.W.2d 249 (1930). If it occurs after the expiration of the term, the measure of damages is the amount of agreed wages for the term. *Id.* Under both calculations, the damage award is reduced by the sum of wages the employee actually earned or could have earned with reasonable diligence in other employment during the contract term. *Id.; see also Western Grove School Dist.* v. *Strain,* 288 Ark. 507, 707 S.W.2d 306 (1986).

In comparison, it is inherently difficult to fix damages for the wrongful discharge of an employee who is employed for an indefinite term since the duration of the contract is uncertain. A number of courts have awarded future damages for the breach of an employment contract not having a fixed term. *Kerr* v. *Gibson's Products Co. of Bozeman,* ___ Mont. ___, 733 P.2d 1292 (1987). These courts commonly base prospective awards on various factors such as the number of years that the employee has been working for the company, the average seniority at the company, and number of years the employee intends to stay with the company. *Panhandle Eastern Pipe Line Co.* v. *Smith,* 637 P.2d 1020 (Wyo. 1981). This approach is too speculative and uncertain. We conclude that the sum of lost wages from termination until the day of trial less the sum of any wages that the employee actually earned or could have earned with reasonable diligence is the general measure of damages in a public policy wrongful

discharge action. In addition, an employee can recover for any other tangible employment benefit lost as a result of the termination. Future damages are not recoverable.

Sterling argues that the trial court erred in refusing to allow its economic expert to testify as to the income Oxford earned from the sale of real estate holdings for the purpose of mitigating damages. In 1984 and 1985, the two years subsequent to Oxford's termination, he sold the balance of the real estate holdings that he had acquired during his employment with Sterling. The amount of damages to which Oxford is entitled is reduced only by the sum he actually earned or could have earned in other employment. *Seaman, supra.* Since the income he earned from the sale of his real estate holdings was not earnings or wages from other employment, the trial court did not err.

Sterling also contends that the trial court erred in denying its motion in limine which sought to exclude evidence of the federal government audit and negotiated settlement concerning the pricing violations. In the absence of an abuse of discretion, we will not reverse a trial court's ruling that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice. *Kelley* v. *Wiggins*, 291 Ark. 280, 724 S.W.2d 443 (1987); *Evans* v. *Wilson*, 279 Ark. 224, 650 S.W.2d 569 (1983). The evidence of the audit and settlement was relevant in that it corroborated the testimony of Oxford that he was forced to resign for reporting Sterling to the federal government for pricing violations in Sterling's contract with the GSA. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Ark. R. Evid. 403. The trial court properly admitted the evidence.

## IV. MOTION FOR COSTS AND ATTORNEY FEES

Oxford has filed a motion on appeal for costs and attorney fees alleging that the deficiency of Sterling's abstract necessitated the filing of a supplemental abstract. Sterling has moved to strike Oxford's supplemental abstract arguing that Oxford overly emphasized or selectively highlighted excerpts of the transcript in an improper manner. Ark. Sup. Ct. R. 9(e)(1) provides in pertinent part as follows:

If the appellee considers the appellant's abstract to be defective, he may, in his printed brief, call the deficiencies to the court's attention and, at his option, may submit a supplemental abstract. When the case is considered on its merits the court may impose or withhold costs to compensate either party for the other party's non-compliance with this Rule.

Rule 9(e)(1) authorizes reimbursement to an appellee only where there has been a clear-cut and demonstrable failure by the appellant to properly abstract matters essential to a full consideration of the issues raised on appeal. *Arkota Industries, Inc.* v. *Naekel*, 274 Ark. 173, 623 S.W.2d 194 (1981). Sterling's abstract is a complete 300 page condensation of the record. It is not defective but rather in compliance with Rule 9(e)(1). Therefore, we deny Oxford's motion for costs and attorney fees.

Oxford's supplemental abstract consists primarily of passages which Sterling had previously condensed in its abstract. Although these passages are not necessary for a full consideration of the issues on appeal, they are not prejudicial or improper. We deny the motion to strike.

Reversed and remanded.

HICKMAN and HAYS, JJ., would reverse and dismiss.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. The majority opinion is well written and well reasoned, with a few minor exceptions. First, the result is wrong; I think this case should be affirmed. The evidence fully supports both outrage and wrongful discharge. There is substantial evidence to support the verdict on either action. The opinion says one thing but does another.

There was evidence before the jury that the appellee had exercised his right and duty as a citizen to inform the government that the appellant was cheating in its business with the government. The appellant paid a million dollars to the government as a result of its conduct being reported. Although the appellee denied being the one who reported the appellant's illegal conduct, he was nevertheless singled out for outrageous treatment under the belief

that he was the one who reported the fraud to the government. It seems to me that this is exactly the situation we had in mind when we first recognized the tort of outrage in *M.B.M. Co. Inc.* v. *Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). Moreover, Ark. Code Ann. § 5-53-112 (1987) makes it illegal for any person to retaliate against an informant by harming or threatening to harm him or another by any unlawful act in retaliation for anything lawfully done by the informant.

The allegations and proof demonstrated that the appellant violated the law in at least two respects. There is no suggestion that the appellee's alleged conduct was illegal. Whistle blowers are usually right but they also usually get the bad end of the deal, as in this case.

Every person has the duty to conform his conduct to the local and national laws. Any good citizen having knowledge that a corporation is cheating the government has a duty to report such conduct. By reversing the judgment on the tort of outrage this court is in effect punishing the appellee for the alleged performance of his duty as a citizen. There is no need to point out additional evidence of the appellant's conduct which constituted the tort of outrage because such facts are stated adequately in the majority opinion.

Certainly the conduct complained of in this case went well beyond the conduct found to be actionable in *Hess* v. *Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985), where there was no evidence whatsoever that Hess violated any law. Apparently the majority finds some sort of distinction between the conduct of Hess, lasting two years, and the conduct of the present appellant, lasting only eighteen months. I have found nothing in any decision to indicate that the duration of the conduct is required to last for any particular length of time. It is the outrageous conduct itself which gives rise to the cause of action. The duration is a matter to be considered in awarding damages.

I agree with the statement quoted by the majority that "[A] termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interests of the economic system or the public good and constitutes a breach of the employment contract." However, I cannot agree with limiting the recovery in public policy

wrongful discharge actions to contract damages. The majority admits only one other state holds such a view.

To limit the recovery of damages for wrongful discharge to backpay is almost beyond belief. Employers exposed to no more liability than this will feel free to retaliate and discriminate at will without fear of penalty for their wilful and intentional conduct. On the other hand an unemployed individual, without prospect for a job, will scarcely be noticed by the system. The conduct by the employer in this case caused the appellee embarrassment, humiliation, physical and mental problems, and severe financial losses. None of these elements of damage are recoverable under the majority decision. Recovery limited to back wages is woefully inadequate to compensate for the damages resulting from wrongful discharge.

The opinion itself demonstrates the inherent difficulties in limiting damages for wrongful discharge to loss of wages and "other intangible employment benefits." The cost of winning a suit limited to this recovery effectively denies most employees any relief. The majority states all the reasons this judgment should be affirmed and then turns right around and reverses it.

It makes no difference whether the appellee was, in fact, the person who reported the appellant to the government. There was no justification for the humiliation and wrongful discharge of the appellee. Such conduct by the appellant should not be condoned by this court under any theory.

Supplemental Opinion on Denial of Rehearing
April 4, 1988

747 S.W.2d 579

PER CURIAM. Petition for rehearing is denied.

PURTLE, J., dissents.

DUDLEY, J., would grant rehearing.

JOHN I. PURTLE, Justice, dissenting. I agree with the petitioner and *amicus curiae* that we should reconsider our opinion in this case and grant rehearing. Several independent attorneys, the Arkansas Trial Lawyers Association, and the

AFL/CIO have joined in this impressive brief filed in support of the petition for rehearing. Their arguments are very persuasive.

The outstanding characteristic of the opinion in this case is that it clearly requires employees to suffer considerably more outrageous conduct by employers than is required of non-employees. This is a distinction not previously made by any court so far as I can determine. It is a result argued by no one and sought by no one.

I agree with petitioner that this court erroneously substituted its own view of the facts for that of the jury. The evidence presented to the jury concerning the employer's conduct toward this petitioner showed that the employer:

1. communicated the false message to other employees that the appellant blew the whistle on their overcharges to the government causing the company to pay over $1,000,000 in penalties or fines;

2. demoted him from highest paid sales position to that of a beginning salesman and transferred him to an especially created sales area in Texas;

3. wrote a letter to him setting up his termination (This typed letter had been used to get rid of others);

4. repeatedly and falsely accused him of misconduct when they knew he was under severe stress;

5. refused to issue stock he had earned;

6. sent him on many false sales leads;

7. made unauthorized deductions from his salary or commission;

8. threatened to sue him;

9. placed him under surveillance by other employers;

10. continued this type of conduct for eighteen months; and

11. admitted its conduct was intended as "harassment."

That's only eleven of the overt acts directed at the appellant.

What course of action short of physical violence could be more outrageous? Obviously the appellee desired to inflict this humiliation and embarrassment upon the petitioner in order to get even with him because they thought he was a "whistle blower."

The tort of outrage was described by this court in *Growth Properties* v. *Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984), where we stated:

> [T]he essence of the tort of outrage is the injury to the plaintiff's emotional well-being because of outrageous treatment by the defendant. If the conduct is sufficiently flagrant to give rise to tort, then the injury the law seeks to redress is the anguish itself and it need not rest, parasitically, on more demonstrative loss or injury. . . . [T]he argument confuses the intent to cause suffering with the intent to do an act from which suffering can be expected to result. The former may be maliciously intended while the latter may be merely the result of conscious indifference to the consequences. But even the latter, if sufficiently wanton, will sustain the award.

These words defining the tort of outrage describe well the activities of the employer in this case. In fact, the acts of the appellant in this case go beyond the wrongful acts in every case where we have recognized this tort.

"Wrongful discharge" by its very terms is a "tort." If based upon contract the suit would be for damages for breach of contract or for specific performance. Every charge in the complaint and every pleading and the judgment in this case relate to a tort. As if by "plain error" this court reached back into the past, pulling out an archaic ruling from the only jurisdiction so holding, to declare for the first time ever that this "tort" is a "contract". I agree with petitioner that: "For this court to adopt an exclusive contract remedy for wrongful discharge and then make the measure of damages back pay [up until] trial would not merely put Arkansas in a distinct minority but would, in fact, make it by far the most regressive state in protecting workers and the public welfare."

We should reconsider our opinion and grant a rehearing in order that our laws and decisions relating to the tort of outrage and the employment-at-will doctrine remain intact. It is not necessary to overrule any precedent or construe any statute to reach the just and fair result of granting rehearing.