**Michael D. GOWER, Plaintiff,**

v.

**IKON OFFICE SOLUTIONS, INC., Defendant.**

No. 00–2244–JWL.

United States District Court, D. Kansas.

July 10, 2001.

Wesley A. Cottrell, Rogers, AR, Carl A. Gallagher, Patrice M. Brown, Juliann Johnson, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for plaintiff.

Robert J. Harrop, Loyd E. Owen, Jr., Kathleen M. Nemechek, Lathrop & Gage L.C., Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Michael D. Gower filed suit against his former employer, defendant IKON Office Solutions, Inc., alleging wrongful discharge in violation of public policy and breach of contract. Specifically, plaintiff alleges that he was discharged after he complained about a billing procedure proposed by defendant with respect to one of defendant's customers, a procedure that plaintiff asserts would have violated federal securities laws. This matter is presently before the court on defendant's motion for summary judgment (doc. # 75). As set forth in more detail below, defendant's motion is granted in part and denied in part. Specifically, defendant's motion is granted with respect to plaintiff's breach of contract claim and with respect to plaintiff's claim for punitive damages in connection with his public policy wrongful discharge claim. The motion is otherwise denied.

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Michael D. Gower began his employment as a sales representative with Modern Business Systems in June 1990, working out of an office in Northwest Arkansas. In 1996, defendant IKON Office Solutions, Inc. acquired Modern Business Systems and plaintiff remained in his sales representative (or "major account representative") position in defendant's Arkansas office after the acquisition. IKON provides a broad range of office and technology management supplies and services, including the sales of office equipment and copiers. IKON's Arkansas office is part of IKON's Kansas City Marketplace. Kent Clark was the Marketplace President for the Kansas City Marketplace during the time period relevant to plaintiff's claims.

In June 1998, plaintiff and another IKON employee, Kim Gregory, teamed up to handle a number of accounts, including the Wal–Mart account. Prior to that time, plaintiff had serviced the Wal–Mart account on his own. In January 1999, plaintiff and Mr. Gregory obtained one of the largest lease contracts in defendant's history-leasing 488 copiers to Wal–Mart for use in Sam's Club stores throughout the country. Shortly after IKON and Wal–Mart entered into the lease contract, plaintiff discovered that IKON intended to book and bill the contract before the copiers were actually delivered and installed. In other words, according to plaintiff's evidence, IKON intended to bill Wal–Mart for the entire contract at the end of February 1999 despite the fact that the vast majority of the copiers were not going to be installed until sometime in early to mid-March 1999.

After contacting IKON's billing personnel to ensure that Wal-mart had not yet been billed for equipment that had not been delivered and installed, plaintiff contacted Kent Clark to express his concern about the billing process. Plaintiff and Mr. Clark discussed the billing process on March 2, 1999. During this conversation (which plaintiff recorded), Mr. Clark explained to plaintiff that he had communicated with Wal–Mart representatives about the proposed billing procedure and that Wal–Mart had agreed to the procedure. Specifically, Mr. Clark explained that Wal–Mart had agreed that IKON could bill Wal–Mart for the entire contract on February 28 so long as IKON provided a credit back to Wal–Mart the next month for any equipment that had not been delivered and installed. According to Mr. Clark, IKON wanted to bill the entire contract in February because it "wanted to make a statement-this is a big account [and] they want to make a statement to Wall Street." At no time during his conversation with Mr. Clark did plaintiff express concern that the contemplated billing process could mislead IKON investors or that the contemplated billing process was somehow unlawful. Rather, plaintiff stated to Mr. Clark: "My main goal is to take care of a customer that it took me 8 years to get. And I want to make sure they're taken care of." Plaintiff also stated to Mr. Clark: "I don't want to do anything to jeopardize [the account], that's my whole point."

Apparently unsatisfied with Mr. Clark's explanation of the billing process, or perhaps not believing that Wal–Mart agreed to the process, plaintiff, on March 3, 1999, sent an e-mail message to Jim Forese, IKON's CEO. In the e-mail, plaintiff expressed his concern that IKON was "on the verge of losing [the Wal–Mart] account" because Kent Clark was "doing some things that are definitely unethical and possibly illegal." The record does not reflect whether Mr. Forese ever responded to plaintiff's message. In any event, the next day, Mr. Clark advised plaintiff that IKON had decided to delay billing Wal–Mart until the end of March and that, as a result, Wal–Mart essentially would receive a month free for those copiers that had been installed. According to IKON, it decided to delay the billing because that method was easier than the pro-rated method that had been contemplated earlier. According to plaintiff, IKON decided to delay the billing because of plaintiff's complaints. Regardless of IKON's reasoning, the end result was that Wal–Mart was billed for the contract only after the copiers were delivered and installed.

The following morning, on March 5, 1999, plaintiff attended a meeting at Wal–Mart's offices in Bentonville, Arkansas. That meeting was also attended by Kent Clark, Kim Gregory and several Wal–Mart representatives. For some reason, plaintiff still believed that IKON intended to bill Wal–Mart before all the equipment was installed and he confronted Mr. Clark about the billing process during the meeting and in front of the Wal–Mart representatives. While it is undisputed that there was "some hollering" between plaintiff and Mr. Clark during this confrontation, plaintiff contends that he remained "in control" the entire time. Mr. Clark contends that plaintiff was belligerent and unprofessional. In any event, following the meeting, IKON placed plaintiff on a leave of absence with pay. After the initial one-week leave, IKON placed plaintiff on an additional week of leave with pay.[1]

---

1. On March 8, 1999, while on leave, plaintiff sent an e-mail message to Stacy Bagosy, a member of IKON's ethics committee. In his e-mail, plaintiff recounted his complaints regarding the handling of the Wal–Mart account.

At the end of plaintiff's leave of absence, Mr. Clark and plaintiff's direct manager, Bob Kendall, met with plaintiff to discuss his return to work. In that regard, Mssrs. Clark and Kendall provided to plaintiff a document entitled "Conditions of Reinstatement" that detailed various conditions that plaintiff was required to accept prior to returning to his position. These conditions included the removal of plaintiff from the Wal–Mart account. Believing that these conditions (particularly the loss of the Wal–Mart account) would result in a substantial loss of income to plaintiff, plaintiff refused to accept them. Thus, plaintiff's employment with IKON was terminated.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71, 106 S.Ct. 2505. In attempting to meet that standard, a movant that does

not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

● Plaintiff's Wrongful Discharge Claim

As alleged in the pretrial order, plaintiff claims that defendant terminated plaintiff's employment because plaintiff complained about defendant's billing practices with respect to the Wal–Mart account. According to plaintiff, IKON's attempt to book and bill the Wal–Mart contract before the equipment was delivered and installed was an attempt to recognize revenue before it was earned-a violation of section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. Defendant moves for summary judgment on a variety of grounds: that plaintiff failed to make a protected report of a violation of state or federal law; that plaintiff cannot establish a causal connection between his alleged whisteblowing and defendant's decisions regarding plaintiff's employment; and that plaintiff, as a matter of law, was not constructively discharged. In the alternative, defendant moves for summary judgment on plaintiff's claim for punitive damages in connection with his public policy wrongful discharge claim. As set forth below, with the exception of defendant's argument concerning punitive damages, the court denies defendant's motion with respect to plaintiff's wrongful discharge claim.

● Protected Report of a Violation of State or Federal Law

■ The parties agree that Arkansas law applies to plaintiff's claims. The well-established rule under Arkansas law is that "when an employee's employment is for an indefinite term, either party may terminate the relationship without cause or at-will." *Palmer v. State Council on Economic Education*, 344 Ark. 461, 40 S.W.3d 784, 788 (2001) (citing *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988)).[2] The Arkansas Supreme Court, however, has recognized several exceptions to the employment-at-will doctrine, including an exception for cases in which employees are discharged in violation of the general public policy of the state. See *id.* (citing *Sterling*, 743 S.W.2d at 383–85). As the court stated in *Sterling*:

An employer should not have an absolute and unfettered right to terminate an employee for an act done for the good of the public. Therefore, we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state. This is a limited exception to the employment-at-will doctrine. It is not meant to protect merely private or proprietary interests.

743 S.W.2d at 385. The court concluded that the public policy of Arkansas is contravened "if an employer discharges an employee for reporting a violation of state or federal law." *Id.* at 386. In short, the *Sterling* court recognized that "[i]n order to further the public good, citizens of the state should be encouraged to report illegal activity." *Id.*

■ In its motion for summary judgment, defendant contends that plaintiff has failed to come forward with sufficient evidence that he made a protected report of a violation of state or federal law. Specifically, defendant contends that plaintiff failed to report defendant's conduct to an outside agency; that plaintiff complained only about defendant's performance of its contractual obligations to Wal–Mart or a violation of internal company policies; and that defendant's proposed conduct would not have violated any state or federal law. The court addresses each argument in turn.[3]

■ Defendant's first argument is easily rejected. According to defendant, it is entitled to summary judgment because plaintiff never reported defendant's con-

**2.** Plaintiff concedes that his employment with IKON was at-will.

**3.** As an initial matter, defendant argues that plaintiff failed to identify in his complaint any specific constitutional or statutory violation that defendant's conduct allegedly violated.

This argument lacks merit. The pretrial order, which supersedes the complaint, see *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir.2000), clearly contains plaintiff's allegation that defendant's conduct would have violated federal and/or state securities laws.

duct to any law enforcement or administrative agency. As plaintiff highlights, however, while Arkansas courts have never directly addressed this issue, a review of the relevant Arkansas cases does not reflect that such a requirement is contemplated by the Arkansas courts. See, e.g., *Sterling*, 743 S.W.2d at 382, 386 (upholding jury verdict in favor of plaintiff on public policy wrongful discharge claim where, in fact, plaintiff actually denied reporting any activity to anyone). In Sterling, the defendant believed that the plaintiff had reported its misconduct to GSA. *Id.* 743 S.W.2d at 381. GSA, however, was not a disinterested governmental agency to which the plaintiff allegedly made a report. Rather, the defendant and GSA were engaged in contract negotiations and defendant's alleged misconduct occurred in connection with those negotiations. Id. In other words, to the extent the plaintiff notified GSA of defendant's conduct (which the plaintiff disputed anyway) he would have notified GSA not because it was a governmental agency but because it was the agency that was contracting with the defendant. See also *Skrable v. St. Vincent Infirmary*, 57 Ark.App. 164, 943 S.W.2d 236, 237–38 (1997) (employee terminated after threatening to report alleged employer misconduct to Arkansas Department of Human Services, an agency that had a contractual relationship with the plaintiff's employer and alleged misconduct related to underlying contract) (summary judgment granted on other grounds). Thus, even if the court were to read into Arkansas law a requirement that a person must report violations of law to a third party, that requirement has been met here-plaintiff raised his concerns at the March 5, 1999 Wal–Mart meeting. In short, defendant has not shown that a whistleblower is required under Arkansas law to contact an outside agency in order to avail himself of protection under the public policy exception.

Defendant next contends that summary judgment in its favor is warranted because the record contains no evidence that plaintiff was concerned about any violation of the law. According to defendant, the record reflects only that plaintiff was concerned about defendant's performance of its contractual obligations with respect to the Wal–Mart account or, at the very most, about violations of internal company policies regarding proper billing procedures. It is uncontroverted, however, that plaintiff, in his e-mail to Jim Forese, expressly reported his concerns about the "possibly illegal" billing procedure. Defendant's papers fail to address this evidence in any way, let alone the significance of the evidence. Similarly, defendant's papers ignore the timing of plaintiff's e-mail to Mr. Forese—it was sent the day after plaintiff's conversation with Mr. Clark in which Mr. Clark advises plaintiff that the company decided to book and bill the Wal–Mart contract at the end of February because the company "wanted to make a statement to Wall Street." In short, the court simply cannot conclude on this record that plaintiff lacks any evidence that he was concerned about a violation of the law.

Defendant's final argument regarding whether plaintiff made a "protected report of a violation of state or federal law" is that defendant's conduct would not have violated the law in any event. The court denies defendant's motion as triable issues of fact exist as to whether defendant's proposed billing procedure would have violated the federal securities laws. If, for example, defendant had billed and recognized revenue of $500,000 in connection with the Wal–Mart contract but actually earned only $400,000 after accounting for any credit due back to Wal–Mart, then it is at least feasible that defendant's investors could have been misled. See, e.g., *Provenz v. Miller*, 102 F.3d 1478 (9th Cir.1996)

(triable issues existed with regard to securities fraud claim that company recognized revenue from licensing agreements before it was earned). Summary judgment is denied.

● Causal Connection

■ Next, defendant maintains that summary judgment in its favor is appropriate because there is no evidence of any causal connection between plaintiff's alleged whistleblowing and any adverse action taken by defendant. In support of this argument, defendant first argues that the record is devoid of any evidence that Mr. Kendall or Mr. Clark, the decisionmakers with respect to the Conditions of Reinstatement, were even aware of plaintiff's e-mail message to Mr. Forese—the only "report" in which plaintiff complained of "illegal" activity. However, just one day after plaintiff sent his e-mail to Mr. Forese, Mr. Clark advised plaintiff that defendant had decided to delay the billing until all equipment had been installed. A reasonable jury, then, could infer that Mr. Forese, having received notice from an employee about potential illegal activity with respect to defendant's largest account, contacted Mr. Clark about the contents of plaintiff's e-mail.

Defendant also argues that its "legitimate reasons for its actions ... negate any causal connection." In that regard, defendant asserts that Mr. Kendall and Mr. Clark "perceived a lack of activity on plaintiff's accounts in late 1998 and early 1999." To the extent defendant suggests that it decided to place conditions on plaintiff's employment because of a lack of activity on plaintiff's accounts, this argument is rejected. Significantly, there is no evidence that defendant imposed the Conditions of Reinstatement on plaintiff because of any lack of activity on plaintiff's accounts. While one particular condition (a reduction in plaintiff's monthly draw) expressly states that it is "due to ... lack of

activity in all of [plaintiff's] accounts for the past six months," there is no evidence that any of the other conditions were based on any perceived lack of activity, or that the initial decision to place conditions on plaintiff was based on any lack of activity with respect to plaintiff's accounts. In short, because defendant has not demonstrated as a matter of law that conditions were placed on plaintiff's employment as a result of perceived inactivity on plaintiff's accounts, defendant's motion on this basis is denied.

Finally, defendant contends that its decisions were based on plaintiff's insubordinate and disruptive conduct at the March 5, 1999 Wal–Mart meeting. According to defendant, this proffered reason is, as a matter of law, a legitimate nonretaliatory basis for its actions with respect to plaintiff's employment. The problem, however, is that plaintiff's allegedly disruptive and insubordinate conduct is inextricably intertwined with his continued complaints about defendant's proposed billing practices. Thus, while plaintiff's conduct may have "provided ample justification" for defendant's actions and may have "provided an appropriate basis for discharge" (as defendant asserts in its papers), there is still a question of fact concerning whether plaintiff's allegedly insubordinate behavior was the true reason for defendant's actions or whether the contents of plaintiff's complaints motivated defendant's decisions. Moreover, factual issues exist with respect to the nature of plaintiff's conduct during the Wal–Mart meeting. While defendant asserts that plaintiff was insubordinate, unprofessional and "disruptive," plaintiff testified that he remained "in control" during the entire meeting. Defendant's motion for summary judgment, then, is denied with respect to this issue.

● Constructive Discharge

■ Defendant also moves for summary judgment on plaintiff's wrongful dis-

charge claim on the grounds that plaintiff has failed to show that he was constructively discharged.[4] Under Arkansas law, a constructive discharge "exists when an employer intentionally renders an employee's working conditions intolerable and thus forces him to resign." See *Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380, 386 (1988) (citation omitted). It exists "only when a reasonable person would have resigned under the same or similar circumstances." *Id.* As set forth below, a reasonable jury could conclude that defendant imposed the Conditions of Reinstatement on plaintiff with the intention of causing plaintiff to resign because of his complaints with respect to defendant's contemplated billing procedure on the Wal–Mart account. Moreover, there is sufficient evidence in the record to support the conclusion that a reasonable person would have resigned under the same or similar circumstances. Thus, defendant's motion for summary judgment on this basis is denied.

Plaintiff's constructive discharge claim is based in large part on defendant's decision to remove him from the Wal–Mart account.[5] According to plaintiff's evidence, the removal of the Wal–Mart account would have resulted in a substantial loss of income to plaintiff.[6] While plaintiff has no direct evidence concerning the income he would have earned had he retained the Wal–Mart account, he presents evidence that Kim Gregory (who was solely responsible for the Wal–Mart account after plaintiff's resignation) earned the vast majority of Mr. Gregory's regular commissions from the Wal–Mart account. It is also uncontroverted that Mr. Gregory earned "well over" a six-figure income because of the Wal–Mart account. Thus, a reasonable jury could infer that plaintiff, had he retained responsibility for the Wal–Mart account, could have earned a substantial income as a result of that account. Stated another way, a reasonable jury could infer that plaintiff, in effect, lost a substantial portion of his income when defendant removed him from the Wal–Mart account. In light of such circumstances, it is reasonable to conclude that defendant, by taking away plaintiff's most profitable account, intended for plaintiff to resign. Moreover, the record supports the conclusion that a reasonable person, faced with a similar, significant reduction in pay, would feel compelled to resign. See James v. Sears, Roebuck & Co., 21 F.3d 989, 993 (10th Cir.1994) (demotion or reassignment to a job with lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge); accord Douglas v. Orkin Exterminating Co., No. 98–8076, 2000 WL 667982, at *4 (10th Cir. May 23, 2000) (genuine issues of fact existed as to whether plaintiff was constructively discharged when employer terminated his employment after he refused to accept a demotion that would have reduced his monthly compensation by more than one-half). Defendant's motion for summary judgment on this basis is denied.

4. Although plaintiff's employment was "terminated" after he refused to accept the Conditions of Reinstatement, both parties apparently construe this termination as a resignation in that plaintiff was given a choice to return to work.

5. In its papers, defendant contends that plaintiff cannot rely on the removal of the Wal–Mart account in support of his constructive discharge claim because this was a "legitimate action" taken by defendant. Defendant's argument, of course, ignores the fact that whether the action was "legitimate" is, in itself, a question of fact.

6. Under the Conditions of Reinstatement, plaintiff was entitled to continue to receive commissions from the Wal–Mart account, but only through June 1999.

● Punitive Damages

■ Defendant maintains that, should there be any issues left for trial with respect to plaintiff's wrongful discharge claim (which, of course, the court has concluded there are), plaintiff is not entitled to punitive damages. Defendant's argument finds support under Arkansas law as the Arkansas Supreme Court, unlike most courts, has held that public policy wrongful discharge claims sound in contract, rather than tort. See Sterling, 743 S.W.2d at 385 (expressly adopting minority view). In so holding, the Arkansas Supreme Court explained the general measure of damages in such cases:

> We conclude that the sum of lost wages from termination until the day of trial less the sum of any wages that the employee actually earned or could have earned with reasonable diligence is the general measure of damages in a public policy wrongful discharge action. In addition, an employee can recover for any other tangible employment benefit lost as a result of the termination. Future damages are not recoverable.

*Id.* at 386–87.

■ In an effort to avoid the conclusion mandated by Sterling, plaintiff contends that Arkansas law permits the recovery of punitive damages where there is a "willful or malicious act in connection with the contract." In support of his argument, plaintiff relies only on Curtis v. Partain, 272 Ark. 400, 614 S.W.2d 671, 673 (1981)— a case that has nothing to do with public policy wrongful discharge claims and, in any event, was decided prior to Sterling. Plaintiff points to no case under Arkansas law in which punitive damages were available in a public policy wrongful discharge action. The court finds the Sterling decision dispositive of the punitive damages question and concludes that plaintiff is not entitled to recover punitive damages in connection with his wrongful discharge claim. Defendant's motion for summary judgment on this issue is granted.

● Plaintiff's Breach of Contract Claim

■ As articulated by plaintiff in the pretrial order, plaintiff's breach of contract claim is based on defendant's alleged breach of its "obligation to act in good faith and deal fairly with plaintiff in addressing his concerns about illegal conduct." As defendant points out in its papers, however, Arkansas does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing in the wrongful discharge context. See, e.g., *Coatney v. Enterprise Rent–A–Car Co.*, 897 F.Supp. 1205, 1211–12 (W.D.Ark.1995) (granting summary judgment on separate claim of breach of implied covenant of good faith and fair dealing in wrongful discharge case after concluding that Arkansas courts would not recognize such a cause of action). In response to defendant's argument, plaintiff concedes that Arkansas does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing, but argues that he is in fact "bringing a claim for breach of contract, of which the implied covenant is simply an element."

While the nature of plaintiff's argument is not exactly clear, the court nonetheless rejects it for two reasons. First, the pretrial order very clearly states that plaintiff's breach of contract claim is based in its entirety on the implied covenant of good faith and fair dealing. In fact, the first sentence of the section in the pretrial order entitled "Breach of Contract" states: "Plaintiff is entitled to recover for breach of the covenant of good faith and fair dealing under Arkansas law." Similarly, the "Nature of the Case" section of the pretrial order states that "plaintiff alleges that IKON breached the implied covenant

of good faith and fair dealing in his employment contract with IKON." Thus, to the extent that plaintiff suggests that his breach of contract claim is based on something other than the implied covenant of good faith and fair dealing, no such claim has been preserved in the pretrial order and, thus, has been waived. See *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 668 (10th Cir.1991) (issues not preserved in the pretrial order have been eliminated from the action). Second, in response to defendant's motion, plaintiff has wholly failed to explain in any way (other than the single sentence referenced above—that plaintiff is "bringing a claim for breach of contract, of which the implied covenant is simply an element") the nature of his breach of contract claim. In other words, while plaintiff may contend that his breach of contract claim is based on some provision or promise other than an implied covenant of good faith and fair dealing, he has simply not explained or even suggested in his papers what that provision or promise might be or how defendant breached such provision or promise. Thus, even if plaintiff had preserved some other breach of contract theory in the pretrial order, plaintiff's claim nonetheless would not survive defendant's motion because he has failed to meet his burden of showing that genuine issues of material fact exist with respect to his breach of contract claim.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion for summary judgment (doc. # 75) is granted in part and denied in part. The motion is granted with respect to plaintiff's breach of contract claim and with respect to plaintiff's claim for punitive damages in connection with his public policy wrongful

discharge claim. The motion is otherwise denied.

IT IS SO ORDERED.