# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2879WA

_____

Charles Tatom,

        Appellee,

v.

Georgia-Pacific Corporation,

        Appellant.

\*
\*
\*
\*
\* On Appeal from the United
\* States District Court
\* for the Western District
\* of Arkansas.
\*
\*
\*

_____

Submitted: April 14, 2000

Filed: October 10, 2000

_____

Before McMILLIAN, ROSS, and RICHARD S. ARNOLD, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Georgia-Pacific Corporation appeals from the District Court's denial of its motion for judgment as a matter of law following a jury verdict in favor of Charles Tatom in his action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq. Tatom claimed that his suspension in May 1994 was a constructive discharge and was based upon his age. Georgia-Pacific argues that the evidence was insufficient to support the verdict. For the reasons discussed below, we reverse the judgment of the District Court and remand with instructions to enter judgment in favor of Georgia-Pacific.

## I.

In 1956, at the age of 21, Tatom began working in the paper-making industry as an hourly employee. In 1983, Tatom was moved up from an hourly position to a front-line supervisor at the paper mill owned by Great Northern Nekoosa Corporation in Ashdown, Arkansas. Roger Brear, General Manager of the mill, approved the promotion. In 1990, Georgia-Pacific purchased the Ashdown mill from Great Northern in a hostile takeover. At the time, Tatom was assistant superintendent of the No. 62 paper machine.

In the fall of 1992, upon the expiration of a two-year employee protection plan for the salaried workers, Georgia-Pacific initiated a reorganization and downsizing which ended in late 1993. During the downsizing, approximately 100 workers lost their jobs, of whom approximately 20 were salaried employees. Two of the seven department heads at the mill were among those salaried employees who lost their jobs, essentially based upon Brear's decision. One was 58 years of age,[1] and the other was 62. The remaining five department heads were between 30 and 50 years old.

In August 1992, Karen Dickinson, Fine Paper Manager at the mill, and Tim Crawford, Production Manager of the mill, promoted Tatom to superintendent over both Number 61 and Number 62 paper machines. With this promotion, Dickinson became Tatom's immediate supervisor. Near the end of 1993, Tatom told Dickinson that he planned to retire in March 1994. Dickinson told him that Georgia-Pacific did not want him to retire, and she, Crawford, and Brear prevailed upon Tatom not to resign.

---

[1]This individual, Walter Rothermel, prevailed in an age discrimination action against Georgia-Pacific, Rothermel v. Georgia-Pacific Corp., 78 F.3d 589 (Table), 1996 WL 91925 (8th Cir. 1996) (per curiam). This fact was not known by the jury in the present case.

In February 1994, Dickinson recommended a raise for Tatom, and Brear approved it. In April 1994, the superintendent of No. 64 machine quit without notice, and Tatom was asked and agreed to take over as superintendent of that machine. The No. 64 machine, one of the largest papermaking machines in the world, was not operating up to standard, and it was felt that Tatom could help. During the first week of May 1994, Dickinson gave Tatom a commendable rating on his annual review.

On Friday, May 13, 1994, No. 64 machine was shut down for repairs. Georgia-Pacific safety regulations require all employees to "lock out" any section of a machine before entering it for repair work. Each employee must use his own personal lock on the lock box, even if another employee already locked out that section of the machine with his own lock. This precaution is to prevent someone from starting up the machine while another employee may still be working in it. It is undisputed that Tatom did not follow proper safety procedures in locking out No. 64 machine on May 13. An hourly employee working on the machine under Tatom's supervision filed a grievance with the union asserting that Tatom forced him into the press section of No. 64 machine knowing that section was not properly locked out. Following an investigation by a fact-finding committee, the mill's labor-relations manager who served on the committee recommended to Dickinson that Tatom be fired.

By letter dated May 20, 1994, Dickinson told Tatom that, on the basis of statements and witness accounts of the May 13 incident, she had concluded that Tatom's conduct was unprofessional and violated "the very essence of safety." In addition, Dickinson told Tatom that his conduct as superintendent "showed disrespect, sarcasm, mistreatment, and a cavalier attitude," rendering him a hindrance to morale and good order. She told Tatom that as "corrective measures" he was suspended effective May 21, 1994, without pay for 120 days, would not receive a merit increase for 1994, and that upon his return to work he would be expected to conduct himself in a professional manner. The letter concluded as follows: "Your contributions to this mill have been many and your expertise is a tremendous asset! I value our professional

relationship and future prospects for continued success. I will work diligently to support you in all endeavors, with the understanding that only you can effect the change."

Tatom informed Dickinson that he was quitting rather than accepting the suspension. He was 59 years old at the time. Charles Sutton, who was 56 years old at the time, was promoted to replace Tatom on the No. 64 machine. Tatom filed this action claiming that the suspension and attendant conditions constituted a constructive discharge and was motivated by age, in violation of the ADEA.[2]

## II.

The trial focused to a large degree on what actually transpired at No. 64 machine on May 13, 1994. There was testimony that Tatom worked under another employee's lock, and that he also ordered hourly employees into the machine after they told him it was not properly locked out. Tatom admitted that he worked under another employee's lock on the day in question, but he claimed this was a common safety-rule violation at the mill at the time, and that no danger was posed. He denied that he ordered any other employee to work in an area of the machine that was not properly locked out.

Tatom testified that he had no idea there would be any trouble over the incident until he returned to the mill the next day and heard rumors that "they're going to ask for your job." On that Tuesday he received a copy of the union grievance and went to

---

[2]The District Court initially granted Georgia-Pacific's motion for summary judgment. Tatom moved for reconsideration based on newly discovered evidence – the affidavit of Stephen Wilt, the former head of Human Resources at Georgia-Pacific. The District Court granted Tatom's motion, and the case proceeded to trial. Wilt did not testify at trial, but Tatom claims that other witnesses testified to the substance of what was in Wilt's affidavit.

Dickinson's office where he found her with three or four other employees. He told Dickinson "they are after my job." He admitted that he used crude language, for which he later apologized.

Tatom testified that he felt the investigation was unfair, and that the company was making an example of him. He presented evidence of other instances of safety-rule violations that were not punished so severely. He acknowledged, however, that if Dickinson, Brear and others in the company believed the hourly employees' version of what happened on May 13, rather than his own account, his termination would have been justified. After some equivocating, Tatom adopted his deposition testimony that Brear and Dickinson really believed the other employees' version over his own.

Tatom testified that he decided to quit because he "could not live with" the suspension and attendant conditions, which he found to be "intolerable." He felt that by accepting the suspension he would be agreeing with something that wasn't true. As a supervisor he needed the respect of his people, and he thought he wouldn't have that if he took the suspension and returned.

As evidence of age discrimination, Tatom showed that older people in some instances were replaced by younger people at the mill during the 1992-93 downsizing.

The jury returned a verdict in Tatom's favor in the amount of $670,000.00, which was doubled to $1,340,000.00, based upon the finding that the violation of the ADEA was wilful. The Court awarded Tatom an additional $109,617.00 in front pay, $143,729.50 in attorney's fees, and $15,531.47 in costs, for a total judgment in the amount of $1,608,877.97. The District Court denied Georgia-Pacific's motion for judgment as a matter of law, and this appeal followed. Georgia-Pacific argues that there is insufficient evidence to support the verdict.

## III.

Under the ADEA, it is "unlawful for an employer . . . to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Liability depends on whether age " 'actually motivated the employer's decision.' That is, the plaintiff's age must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.' " Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2105 (2000), quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

Tatom presented no direct evidence of discrimination; thus, the three-step burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973), applies to this case. See Regel v. K-Mart Corp., 190 F.3d 876 (8th Cir. 1999). Under this analysis, the plaintiff has the initial burden of establishing a prima facie case, thereby creating a rebuttable presumption of discrimination. Once a plaintiff makes a prima facie case, the employer can rebut the presumption of discrimination by producing evidence of a legitimate nondiscriminatory reason for its decision to terminate the plaintiff. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reason was actually a pretext for discrimination.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2109 (2000) (emphasis ours). However, such evidence will not necessarily permit that conclusion. Id. The ultimate question remains whether the employer intentionally discriminated, and the ultimate burden of proving intentional discrimination remains with the plaintiff. Reeves, 120 S. Ct. at 2108; Taylor v. QHG of Springfield, Inc., 218 F.3d 898, 900 (8th Cir. 2000).

To establish a prima facie case of age discrimination under the ADEA, Tatom had to show (1) he was a member of a protected group, i.e., at least 40 years of age, (2) he was qualified for his position, (3) that he was constructively discharged, and (4) he was replaced by a person not in the protected class, or similarly situated employees who were not members of the protected class were treated more favorably. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000); Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998).

A district court should render judgment as a matter of law only when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). The district court, and the appellate court on de novo review, "should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves, 120 S. Ct. at 2110. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (quotation omitted). "This demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province." Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996).

We first focus on whether there was a "legally sufficient evidentiary basis for a reasonable jury" to find that Tatom was constructively discharged.[3] Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces the employee to quit his job. Spears v. Missouri

---

[3]Constructive discharge is Tatom's sole theory of liability. He does not claim damages for the suspension itself.

Dep't of Corrections & Human Resources, 210 F.3d 850, 854 (8th Cir. 2000); Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996) (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981)). The employer's actions must have been intended to force the employee to quit. Allen, 81 F.3d at 796. The plaintiff can satisfy the intent requirement by showing that his resignation was a reasonably foreseeable consequence of his employer's discriminatory actions. Id.

Additionally, to prove that a constructive discharge occurred, the plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings; the question is whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative. Spears, 210 F.3d at 854-55; Allen, 81 F.3d at 796.

Upon review of the entire record, we conclude the District Court erred in holding there was sufficient evidence to support a finding that Tatom had been constructively discharged. Tatom presented no evidence that it was Georgia-Pacific's intention to force his resignation by suspending him for 120 days. To the contrary, all the evidence points to the fact that Georgia-Pacific valued Tatom as an employee. Furthermore, no reasonable juror could find that the suspension and attendant conditions rendered continued employment with Georgia-Pacific objectively intolerable. In a variety of cases, this Court has held that such things as loss of supervisory responsibilities, a feeling of being unfairly criticized, dissatisfaction with work assignments, and loss of pay are insufficient to constitute a constructive discharge. See Spears, 210 F.3d at 855; (criticism, reprimand, and the denial of a transfer request did not make conditions intolerable); Breeding v. Arthur Gallagher & Co., 164 F.3d 1151, 1160 (8th Cir. 1999) (feeling of being unfairly criticized); Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 575 (8th Cir. 1997) (special scrutiny and criticism of employee's conduct); Allen, 81 F.3d at 796 (suspension for three days without pay due to an alleged

customer complaint, and plaintiff's being told that if he were not pleased with the denial of his transfer request he could quit or become a floater).

Even assuming Tatom established a prima facie case of age discrimination and that there was sufficient evidence for the jury to reject Georgia-Pacific's stated reason for imposing a 120-day suspension – namely, the safety-rule violation and Tatom's behavior during the investigation – we conclude that no rational jury could find that Tatom's suspension was the result of intentional discrimination based on age. As noted above, in an ADEA case it may not be enough for a jury to disbelieve the employer; the fact finder must have evidence on which to base a reasonable belief that age was a determining factor. Reeves, 120 S. Ct. at 2109. Here the main evidence of any age bias on the part of Georgia-Pacific was in the context of the 1992-93 downsizing. Tatom claims that other employees were less severely treated, but some of these were older employees, and in no instance was there a finding of conduct as serious as the findings against Tatom. There is no reasonable basis for a finding of intentional discrimination based upon age.

Accordingly, we conclude that Georgia-Pacific was entitled to judgment as a matter of law. We reverse the judgment of the District Court and remand with instructions to enter judgment on behalf of Georgia-Pacific. A jury verdict should not lightly be set aside, but in this case our duty is to do so.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-9-