Michael D. GOWER, Plaintiff,

v.

IKON OFFICE SOLUTIONS, INC., Defendant.

No. 00–2244–JWL.

United States District Court, D. Kansas.

Dec. 3, 2001.

Wesley A. Cottrell, Rogers, AZ, Carl A. Gallagher, Patrice M. Brown, Juliann Johnson, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for palintiff.

Roger J. Harrop, Loyd E. Owen, Jr., Lathrop & Gage, L.C., Kansas City, MO, Kathleen M. Nemechek, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Shaw, LLP, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, Chief Judge.

The plaintiff Michael D. Gower sued the defendant IKON Office Solutions, Inc., his former employer, alleging wrongful discharge in violation of the public policy of Arkansas and breach of contract. The court dismissed the breach of contract claim on summary judgment. *See Gower v. IKON Office Solutions, Inc.,* 155 F.Supp.2d 1268, 1276–77 (D.Kan.2001). Following a four-day trial in August of 2001, the jury returned a verdict in favor of the plaintiff on his wrongful discharge

claim and awarded him $729,199.41 in lost wages and benefits.

The matter is presently before the court on the defendant's motion for judgment as a matter of law or, alternatively, for a new trial (Doc. 121) pursuant to Federal Rules of Civil Procedure 50(b) and 59(a). The defendant requests that the court overturn the jury's findings and enter judgment in favor of the defendant because, according to the defendant, the court's instructions misstated Arkansas law and the evidence presented at trial was entirely insufficient to support the jury's findings. In the alternative, the defendant requests that the court grant a new trial because, according to the defendant, the jury verdict was against the weight of the evidence and the court improperly admitted certain evidence.

## I. Motion for Judgment as a Matter of Law

At the close of the plaintiff's evidence and again at the close of all evidence at trial, the defendant moved for judgment as a matter of law on all issues under Fed. R.Civ.P. 50(a). The court denied the motion. The defendant now renews its motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b).

### A. Standards

■ Judgment as a matter of law "should be cautiously and sparingly granted," *Zuchel v. City & County of Denver,* 997 F.2d 730, 734 (10th Cir.1993), and is appropriate "only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." *Riggs v. Scrivner, Inc.,* 927 F.2d 1146, 1149 (10th Cir.1991). Such judgment is proper only when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka,* 814 F.2d 1412, 1418 (10th Cir.1987). In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *See Lucas v. Dover Corp.,* 857 F.2d 1397, 1400 (10th Cir.1988). Nevertheless, the court must find more than a mere scintilla of evidence favoring the nonmovant; the court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988).

■ In essence, the court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party. *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1546 (10th Cir.1996). Conversely, the court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law." *Id.* at 1546–47.

### B. Proof of an Actual Securities Law Violation

■ The court instructed the jury that in order for the plaintiff to recover, he had to prove that the defendant proposed to book and bill the Wal–Mart contract prior to the delivery and installation of equipment, and that such a proposal would have violated state securities and/or federal securities laws as set forth in Instruction 11. The defendant contends in its papers that the court erred in giving this instruction because Arkansas law requires that the plaintiff prove that an actual violation of the law occurred.

In sole support of its position, the defendant relies on *Palmer v. Ark. Council on Economic Educ.,* 344 Ark. 461, 40 S.W.3d

784 (2001). In *Palmer*, the plaintiff alleged, among other claims, that she was terminated from her employment with the Arkansas Council on Economic Education because she voiced her concern over the Council's decision to place both state and private funds in the same bank account. The court reasoned that the plaintiff must provide statutory authority to establish that her dispute with her boss was based on a violation of public policy of Arkansas. *Id.*, 40 S.W.3d at 790. The court granted the defendant's motion for summary judgment and concluded that the plaintiff had not put forth a genuine issue of material fact because there are no state statutes that prohibit an entity from combining private and state funds. *Id.* Contrary to the defendant's contentions, this case merely establishes that a plaintiff must advance a theory that could constitute a violation of law. *Palmer* is distinguishable from a situation, as here, where the defendant contends that a statutory violation did not occur because the plaintiff reported the defendant's activity prior to the crime actually being committed. Here the plaintiff did rest his complaint on a theory—securities fraud—that is a recognized criminal

law theory. In *Palmer*, the plaintiff accused the boss of something that simply fails to state a crime. No set of facts could have been proven to constitute a crime of "illegal combining" because the jurisdiction in question, Arkansas, recognized no such crime.

The Arkansas courts have not addressed the precise factual setting of this case.[1] While the language of most Arkansas cases does state that a public policy exception exists "for reporting a violation of state or federal law," taken in context, this court believes that a plaintiff who reports that a violation is going to happen would be encompassed in that definition. This court's primary basis for this conclusion is the fact that the Arkansas Supreme Court has consistently reasoned that it is motivated by a desire to protect the public from illegal activity.[2] *See, e.g., Smith v. American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683, 685 (1991) ("Plaintiff does not allege that he was pursuing some matter in the public interest...."); *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 386 (1988) ("In order to further the public good, citizens of the state

1. In its papers, the plaintiff cites to *Webb v. HCA Health Services of Midwest, Inc.*, 300 Ark. 613, 780 S.W.2d 571 (1989) and *Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1084 (8th Cir.2000) for the proposition that a plaintiff may prove that a violation of law was intended. *Webb*, 780 S.W.2d at 574 ("It may well be that when further evidence is presented at trial, HCA may sustain its position that appellant altogether failed in performing her duties which caused her termination and no falsification existed or was intended. The state of the record on motion for summary judgment does not resolve that fact issue, and therefore, we reverse and remand this cause for trial on the wrongful discharge issue."); *Jarrett*, 211 F.3d at 1084 (holding that the plaintiff had a cause of action because she was fired because she reported but could not conclusively prove that her supervisor manipulated the waiting list for federally subsidized apartments). Although these cases are not analogous to the

issue here because the plaintiffs did not report the defendants before they engage in legal activity, they do establish that courts applying Arkansas law have recognized a cause of action when the defendant did not actually violate a law.

2. Additionally, in *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250, 257 (1986), the sole case the Arkansas Supreme Court relied on in adopting the public policy exception in *Sterling*, the court explained: "The relevant inquiry is not limited to whether any particular law or regulation has been violated, although that may be important, but instead emphasizes whether some important public policy interest embodied in the law has been furthered by the whistle blowing activity." (quotations and citations omitted). This suggests that, if confronted with the issue, the Arkansas Supreme Court would not likely apply a bright-line rule requiring an actual violation.

should be encouraged to report illegal activity."). This court believes that the Arkansas public policy exception applies equally if the defendant announces that it is planning to violate a law but the actual violation does not occur, perhaps because the plaintiff exposed the plans. Moreover, from a policy perspective, the public good would be equally served if a plaintiff reports that a defendant is going to violate the law at some later date thereby preventing the criminal activity from taking place. In sum, given the intent of the public policy exception and the strong policy argument in favor of permitting a person to report illegal activity that is going to occur, this court does not believe that the Arkansas Supreme Court's language was intended to mean that an actual violation of the law must occur before an employee can be protected by the law for reporting that activity.

In fact, the court believes that, if anything, the jury instructions that it gave on a violation of a federal and/or state securities law were actually too onerous on the plaintiff. Specifically, the court is concerned that a plaintiff having to prove the elements of a crime within its cause of action poses too many difficulties. For example, here the defendant argues that the evidence was insufficient to establish that its conduct would have met each of the three elements of a securities law violation. The plaintiff did not object to the court's approach at trial, but perhaps the court should only have asked the jury to consider whether the plaintiff was fired for blowing the whistle and not have asked the jury to have decided whether the facts about which the whistle was blown amounted to the crime. Requiring an employee to know the securities laws and be certain that his or her employer's actions will meet each of the elements of an alleged crime before he or she raises a red flag under the protection of the law imposes an unrealistic burden and is counterpro-

ductive to the purpose of the public policy exception. Nonetheless, even with the more constrained jury instructions, the jury returned a verdict for the plaintiff. Thus, the court will analyze the sufficiency of the evidence with regard to those instructions.

## C. Sufficiency of the Evidence

### 1. Securities Law

The defendant urges this court to enter judgment as a matter of law because the evidence was not sufficient to sustain a verdict on any of the elements of a securities law violation. As outlined above, in order to return a verdict for the plaintiff, according to Jury Instruction 10, the jury had to find that the defendant's proposed actions would have violated state and/or federal securities law as set forth in Instruction 11. Instruction 11 provided the elements of a securities law violation, which include: (1) a misstatement; (2) that is material; and (3) made with scienter.

### a. Misstatement

According to the defendant, no reasonable jury could have believed the plaintiff's theory that a misstatement would have been made if the plaintiff had not acted. The court does not agree. In fact, substantial evidence was presented to the jury to support the conclusion that the defendant proposed to book and bill the Wal–Mart account before the equipment was delivered and installed and more importantly, that the defendant intended to misstate its earnings to Wall Street.

For example, the plaintiff admitted into evidence and repeatedly alluded to a transcript of a recorded telephone conversation between the plaintiff and Kent Clark that took place on March 2, 1999. In that conversation, Mr. Clark told the plaintiff that the Wal–Mart account had been booked for all 488 machines and Wal–Mart

had been billed for $72,000 even though all of the machines were not yet installed. Mr. Clark also revealed that IKON CEO Jim Forese approved of and wanted the Wal–Mart contract billed in February to "make a statement to Wall Street." The evidence was undisputed that most of the machines were not installed by February of 1999. Significantly, the plaintiff points out that Mr. Clark never denied making these statements and, instead, tried to qualify his remarks. The jury apparently disbelieved his explanations. Viewing the evidence in the light most favorable to the plaintiff, a reasonable factfinder could have concluded that the defendant was going to misstate its revenue in February from the Wal–Mart contract.

*b. Materiality*

 The defendant next alleges that, even assuming a misstatement was made, no reasonable jury could have found that the statement was material. Specifically, the defendant argues that booking the Wal–Mart account in February instead of March cannot be material because the Wal–Mart account represented approximately .055% of IKON's total revenues in 1999.

 A statement is material only "if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997) (citing *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also* Jury Instruction 11. "Whether information is material also depends on other information already available to the market; unless the statement 'significantly altered the 'total mix' of information' available, it will not be considered material." *Id.* (citing *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126); *see also* Jury Instruction 11.

The defendant's approach regarding what is material involves a purely numerical analysis. Such an approach has been rejected by the Supreme Court. *Basic Inc. v. Levinson,* 485 U.S. 224, 236 n. 14, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The cases cited by the defendant are also distinguishable because they do not have factors in addition to the numerical value that are significant. Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could have properly concluded that booking the Wal–Mart account prior to installation was a material misstatement not only because of the direct impact it had on the company's earnings, but also because of the potential positive impact announcing a major relationship with Wal–Mart might have in light of the company's troubled fortunes. Evidence was presented that the defendant had faced previous shareholder derivative lawsuits and the stock price was plummeting. In the total mix of things, this positive news might have impacted the decisions of shareholders and prospective shareholders on whether to purchase, hold or sell IKON stock. Of course, if Wal–Mart had canceled the contract because of defects discovered in the products after their delivery, the bloom would have gone off this rosy news—but only after investors might reasonably have relied on it as an indicator that IKON was on its way back up. Moreover, a reasonable jury could have believed that the misstatement was material because Kent Clark's statements suggested that, by booking and billing the transaction in February, IKON's upper level management—CEO Jim Forese and vice-president Gary Strauss—actually did believe, themselves, that the transaction would make a statement to Wall Street, from which one could reasonably infer its materiality to investors.

*c. Scienter*

█ The defendant next alleges that no reasonable jury could have found that the defendant acted with the requisite scienter. The defendant alleges that the only evidence that any statement about the Wal–Mart transaction would be made to the public was a telephone conversation the plaintiff had with his supervisor, Kent Clark. Further, that statement cannot meet the scienter requirement, according to the defendant, because Mr. Clark did not control what transactions were recorded on the books and records of IKON. Therefore, according to the defendant, there was no other evidence in the record that would indicate anyone who had such control intended to make an intentional misstatement. The court does not agree.

█ The term "scienter" has been defined by the Supreme Court of United States as "a mental state embracing an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court further explained that Section 10(b) "was intended to proscribe knowing or intentional misconduct." *Id.* at 197, 96 S.Ct. 1375. Recklessness, defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," can also satisfy the Section 10(b) scienter requirement. *City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1258 (10th Cir.2001) (quoting *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1232 (10th Cir.1996)). "Simple negligence, however, does not satisfy the scienter requirement." *Id.* (citing *Bd. of County Comm'rs of San Juan County v. Liberty Group,* 965 F.2d 879, 883 (10th Cir.1992); *Ernst & Ernst,* 425 U.S. at 197, 96 S.Ct. 1375). Similarly, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Id.* at 1261 (quoting *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000)).

Viewing the evidence presented at trial from the plaintiff's perspective, he established that Mr. Clark proposed to book and bill the Wal–Mart account in February. Mr. Clark stated that such action was not "illegal" or "wrong" as long as the customer agreed to it. This alone indicates that Mr. Clark was aware that it would be illegal if the customer did not agree and the defendant's evidence that Wal–Mart had consented was meager and subject to disbelief by the jury. Moreover, the fact that the contract was being billed in February to "make a statement to Wall Street" and that the February billing was at the direction of IKON CEO Jim Forese, a reasonable jury could have concluded that IKON was taking this action intentionally and for a purpose that transcended a mere accounting practice or procedure. A reasonable jury could have concluded that, despite knowing it was illegal, IKON was going to book the Wal–Mart account even though the equipment was not delivered and installed. In addition, the evidence indicated that the defendant abandoned the idea shortly after the plaintiff called it to task, raising a further inference that the defendant realized its proposed course of conduct was wrongful. Thus, the evidence was sufficient to satisfy the scienter requirement.

*2. Constructive Discharge*

█ The defendant also moves for judgment as a matter of law on the plaintiff's wrongful discharge claim on the grounds that there was insufficient evidence to establish that the plaintiff was constructively discharged. Under Arkansas law, a constructive discharge "exists

when an employer intentionally renders an employee's working conditions intolerable and thus forces him to resign." *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 386 (1988) (citation omitted); *see also* Jury Instruction 12. It exists "only when a reasonable person would have resigned under the same or similar circumstances." *Id; see also* Jury Instruction 12.

### a. Working Conditions

■ The defendant first argues that no reasonable juror could have found that the plaintiff's working conditions were intolerable because if the plaintiff would have remained working at IKON, according to his own testimony, he would have received a substantial income. The court disagrees with the defendant's interpretation of the record. The court rejected this argument on the defendant's motion for summary judgment and continues to find it unpersuasive. *See Gower v. IKON Office Solutions, Inc.*, 155 F.Supp.2d 1268, 1275–76 (D.Kan.2001). Viewing the evidence at trial in the light most favorable to the plaintiff, the court finds that there was sufficient evidence from which a rational factfinder could have concluded that the defendant's working conditions were intolerable.

For example, evidence was presented establishing that under the conditions of reinstatement the plaintiff had twenty-four hours to agree to the terms or he would be terminated. Under the defendant's conditions, the plaintiff was permitted to service only a limited number of accounts that generated only $335,000 of the $8,345,000 in sales that the plaintiff previously serviced.[3] Most importantly, he was not allowed to service the Wal–Mart account, an account he testified that he spent 8 years

obtaining and which provided him with, in his words, "a tremendous portion of his income." Moreover, the plaintiff's draw was reduced from $8,000 to $3,000 per month and he was taken off "earn the right" status, a status he had held for years. Without this status he would have been forced to report his sales activity on a daily basis. In sum, the record supports the conclusion that a reasonable person, faced with similar circumstances would feel compelled to resign. *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 993 (10th Cir.1994) (demotion or reassignment to a job with lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge); accord *Douglas v. Orkin Exterminating Co.*, No. 98–8076, 2000 WL 667982, at *4 (10th Cir. May 23, 2000) (genuine issues of fact existed as to whether the plaintiff was constructively discharged when employer terminated his employment after he refused to accept a demotion that would have reduced his monthly compensation by more than one-half).

The defendant contends that courts faced with similar circumstances have found, as a matter of law, that the plaintiff was not constructively discharged. The combined impact of the conditions of reinstatement, however, resulted in working conditions for the plaintiff that would have been far more intolerable than the situations described in the cases cited by the defendant. For instance, in *Tatom v. Georgia–Pacific Corp.*, 228 F.3d 926 (8th Cir.2000), the Eighth Circuit reversed the district court and found that the working conditions were not intolerable when the plaintiff was suspended for 120 days. *Id.* at 928. Similarly, in the other cases cited

---

**3.** Although the plaintiff never provided a firm dollar figure regarding exactly how much of his salary he would have lost, the court is persuaded from the evidence presented that the plaintiff's allegation that it would have been a substantial amount is accurate.

by the defendant, one employee resigned because he was placed on straight commission without expenses or a company car and was required to sign noncompete agreements, *see EEOC v. Clay Printing Co.*, 955 F.2d 936, 949–50 (4th Cir.1992), one employee resigned because he was required to transfer and the new conditions were speculative, *see Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420 (8th Cir.1995), and one employee resigned because he became an "at-will" employee, his managerial duties and bonus program were reduced and his salary was lowered from $235,000 to $175,000, *see King v. AC&R Adver.*, 65 F.3d 764, 766–68 (9th Cir.1995).

The only case that presents circumstances that even resemble the plaintiff's is *King* and even those circumstances do not approach the magnitude of the plaintiff's circumstances here. In comparison to the approximately twenty-five percent decrease in the employee's salary in *King*, the plaintiff presented evidence that his salary was reduced by a much more substantial amount under the conditions of reinstatement. In *King*, the employee was still making $175,000 while the plaintiff here testified that he could not make a living off his projected salary.

*b. Causation*

■ The defendant next claims that there was no evidence presented showing a causal connection between the plaintiff's alleged whistle blowing activity and his subsequent constructive discharge. In support of this position, the defendant alleges that the plaintiff was placed on a leave of absence and then later offered reinstatement under the conditions of reinstatement, not because of his whistle blowing activities, but because of his insubordinate actions at the March 5, 1999 meeting with Wal–Mart and because of his lowered output over the previous six months. The court rejected this argument in its the

defendant's summary judgment motion. *See Gower v. IKON Office Solutions, Inc.*, 155 F.Supp.2d 1268, 1275–76 (D.Kan.2001). Now viewing the evidence presented at trial in the light most favorable to the plaintiff, the court reiterates its conclusion.

The evidence produced at trial, viewed from the plaintiff's perspective, established that on March 2, 1999 Kent Clark informed the plaintiff that the Wal–Mart contract was going to book and bill in February because the company wanted to "make a statement to Wall Street" and, in the company's view, there was nothing wrong with doing this if the customer agreed. The next day the plaintiff e-mailed IKON CEO Jim Forese to complain about Mr. Clark's "possibly illegal" actions. Then, the following day, Kent Clark changed his point of view and told the plaintiff that the company would not bill the Wal–Mart contract in February. Apparently not satisfied with Mr. Clark's explanations, the plaintiff challenged Mr. Clark at the March 5th meeting with Wal–Mart. With no explanation, the plaintiff was then placed on leave of absence that same afternoon. Significantly, the plaintiff points out that the defendant never documented the alleged unprofessional behavior at the Wal–Mart meeting even though that was the reason the defendant later gave for the plaintiff's leave of absence.

The plaintiff exposes similar inconsistencies surrounding the defendant's explanation for the conditions of reinstatement. The defendant's alleged reason for the conditions was the lack of activity on all of the plaintiff's accounts over the last six months. The evidence revealed, however, that the plaintiff had received a memo from his vice-president of sales congratulating him on a great quarter for the quarter running from October through December of 1998. Then, in January of 1999, the plaintiff, along with Kim Gregory, closed

the multi-million dollar Wal–Mart account. The plaintiff points out that the supposed lack of activity by the plaintiff never surfaced until after he complained about the booking and billing of the Wal–Mart contract. Given the cumulative effect of all of this evidence and the timing of the events, a reasonable factfinder was entitled to discredit the defendant's theories and, instead, conclude that the plaintiff's complaints about the billing of the Wall Mart account was the true reason for the constructive discharge.

## II. Motion for a New Trial

The defendant asks, alternatively, that the court grant a new trial because the verdict was against the weight of the evidence and because the court made "two erroneous and highly prejudicial evidentiary errors."

### A. Standards

■■■■■ "A motion for a new trial made on the ground that the verdict of the jury is against the weight of the evidence normally presents questions of fact and not of law and is addressed to the discretion of the trial court." *Getter v. Wal–Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir. 1995). The evidence is viewed in the light most favorable to the plaintiff. *Macsenti v. Becker*, 237 F.3d 1223, 1235 (10th Cir. 2001). The "inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir.2001) (citing *Getter*, 66 F.3d at 1125). "Absent an award so excessive or inadequate as to shock the judicial conscience and to raise irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." *Hynes v. Energy West, Inc.*, 211 F.3d 1193, 1206 (10th Cir.2000) (citing *Campbell v. Bartlett*, 975 F.2d 1569, 1577 (10th Cir.1992)).

Specific to an evidentiary ruling, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Fed.R.Evid. 103; *see also Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1518 (10th Cir.1995) ("error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties, and the burden of demonstrating that substantial rights were affected rests with the party asserting error") (further citations omitted). A new trial should be granted, however, when the erroneous admission of evidence affected the substantial rights of the parties. *See* Fed.R.Civ.P. 61.

### B. The Jury Verdict Was Against the Weight of the Evidence

■■■■ Wholly without elaboration or an explanation, the defendant claims that the verdict was against the weight of the evidence. The defendant's allegation is patently without merit. The court simply does not believe this is an exceptional case where the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence. On the contrary, the court believes that the verdict is supported by ample evidence, and that it would be inappropriate for the court to disturb the jury's resolution of the conflicting testimony. Accordingly, the defendants' motion for a new trial on the ground that the jury verdict is against the weight of the evidence is denied.

### C. Shareholder Derivative Suits

During the trial, the court permitted the plaintiff to introduce evidence of, and testify about, certain shareholder class action lawsuits filed against the defendant prior to March of 1999. The defendant argues that the evidence should have been kept out because it was not relevant under

Rules 401–402, was unduly prejudicial under Rule 403, and was evidence of alleged bad acts offered to prove conformity therewith under Rule 404(b).

Before trial, the defendant objected to the admission of such evidence in its motion in limine. The court overruled the motion on the record but explained that the evidence would be admissible only for the limited purpose of showing the plaintiff's state of mind and the understanding of the people to whom he was communicating. The court added on the record that the defendant would be entitled to a limiting instruction and that if it wanted it, then it needed to ask for one at the appropriate time during the trial. The defendant never asked for the limiting instruction at trial.

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Only evidence relevant to the plaintiff's claim of wrongful discharge is admissible under Rule 402. Rule 403 provides that although relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury." Finally, Rule 404(b) excludes evidence of other crimes, wrongs or bad acts from admission to prove character in conformity therewith.

■ As the court previously explained on the record at the motion in limine conference, the evidence regarding previous shareholder derivative lawsuits was relevant because it helped to establish what the plaintiff's state of mind was at the time he reported the defendant's activities.[4] One of the defendant's theories was that, in reporting the defendant's activities regarding the Wal-mart account, the plaintiff was purely motivated by a desire to keep Wal–Mart from getting upset. The plaintiff provided evidence, however, that the plaintiff's e-mail to IKON CEO Jim Forese said he was concerned about "potentially illegal" activity. In a vacuum this is ambiguous language. The plaintiff used the shareholder derivative lawsuits to clear up this ambiguity and show that at the time the plaintiff sent this e-mail the people he was talking to recognized that he was concerned about a securities law violation because the company had been subject to previous lawsuits of that nature.

The defendant's argument that the plaintiff's testimony about shareholder derivative lawsuits was unduly prejudicial and was evidence of alleged bad acts offered to prove conformity therewith is wrong. The cases cited by the defendant regarding Rule 404(b) are easily distinguishable because they involve cases where the plaintiff wanted to use past shareholder derivative lawsuits as proof that the defendant was liable again. The plaintiff did not offer it for this purpose nor did the court admit it for this purpose. Its relevance had nothing to do with proving the commission of the alleged fraud here. The court offered on the record at the motion in limine conference that if the defendant wanted it, it was entitled to a limiting instruction, but, presumably for reasons of trial tactics, the defendant did not avail itself of that offer.

4. *In discussing materiality at page 1236 above, the court has also identified an additional basis on which this evidence was relevant, to show the background against which the Wal–Mart good news would send a message to Wall Street even if the numbers were* not that significant in and of themselves. In light of the defendant's failure to seek a limiting instruction consistent with the court's limine ruling, this was another proper use of this evidence.

## D. Telephone Conversation Transcript

■ The court also permitted the plaintiff to admit into evidence transcripts of telephone conversations between the plaintiff and his boss, Kent Clark, among others. The defendant argues that the admission of the transcripts was erroneous because the exhibit was hearsay and there was insufficient foundation for the transcript because the transcriptionist did not testify. The court does not find these contentions persuasive.

At trial, the defendant objected to the admission of this evidence arguing that there was improper foundation and that the conversation was hearsay. At a side bar, the court found that the telephone conversation transcripts were not hearsay because a conversation involving an agent of IKON acting within the scope of his or her employment would be a party admission. The defendant conceded this point and went so far as to state: "I have no objection with respect to those identified as [Michael Gower's] superiors, Mr. Kendall, Kent Clark." The defendant then narrowed his objection to one transcript of a tape recording of a message dated March 1 at 4:58 p.m. between two women in IKON's billing department. The defendant argued that there was improper foundation to admit this conversation because the plaintiff had not shown that he was aware of what these women did at IKON. The plaintiff then laid further foundation establishing that the plaintiff had dealt with the two women on numerous occasions and the evidence was admitted.

Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Under Rule 801(d)(2)(D), however, a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." As explained at trial, the telephone conversations met the definition of a party admission because the people speaking on the tapes were agents of IKON acting within the scope of their employment and the evidence was offered against the defendant. Moreover, the defendant conceded at trial that its objection was limited to a foundation objection regarding the conversation with the two women in IKON's accounting department, thus waiving any double hearsay argument related to admitting the transcripts and not just Mr. Gower's testimony about the conversations. As explained above, the plaintiff provided sufficient foundation for the evidence to be admitted by identifying the two women's voices, who they were and what they did for the company.

■ Regarding the defendant's objection as to foundation because the transcriptionist did not testify, this specific objection was not made at trial so the court would deem it waived. Nonetheless, the objection would not be valid. The court construes the objection as one relating to authentication because the defendant is implying that because the transcriptionist did not testify, the evidence may not have been accurate. The admission of transcripts to assist the trier of fact lies within the discretion of the trial court. *United States v. Devous*, 764 F.2d 1349, 1355 (10th Cir.1985). Transcripts, like other evidence, must be properly authenticated before they can be admitted. Fed. R.Evid. 901(a) provides generally that: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In the criminal context, the Tenth Circuit reasoned that "[w]hile it is true that the

preferable means of authentication is stipulation between the parties or a pretrial determination by the court, the unrebutted testimony of one of the participants in the actual conversation is sufficient to authenticate." *United States v. Wright*, 932 F.2d 868, 880 (10th Cir.1991).

The plaintiff testified that he made the recording, had it transcribed and then listened to the tape while reading the transcript to verify that the transcript was an accurate representation of the recorded conversations. He also testified that he could identify the voices on the tape recordings and the defendant had the chance to cross-examine him on these issues. Moreover, Kent Clark, one of the voices on the tape, admitted the phone calls took place and never denied the accuracy of the transcript. The court continues to believe that the transcript was properly authenticated, that the statements of the defendant's employees were not hearsay and that the exhibit was properly admitted into evidence.

IT IS THEREFORE ORDERED BY THE COURT THAT the defendant's motion for judgment as a matter of law or, in the alternative, for a new trial (Doc. 121) is denied.